Good morning, Your Honors. May it please the Court, my name is Christopher Winter, and I represent the Petitioners, Alaska Eskimo Whaling Commission, and the Inupiat Community of the Arctic Slope in petitions numbers 09-73944 and 10-70368. Petitioners will be splitting their time equally this morning, and we would like to save three minutes for rebuttal if we could. I'm going to discuss claims related to the bowhead whale and touch on the air quality issue if I have time, and my co-counsel, Ms. McDonald, will discuss claims related to emergency preparedness and oil spills. Your Honors, the Alaska Eskimo Whaling Commission has a unique role to play as a co-management agency of the bowhead whale with the National Marine Fisheries Service. The subsistence whalers have brought this case to the Court because the Minerals Management Service simply ignored key aspects of how oil drilling can affect bowhead whales and failed to conduct any analysis of these important issues. The two issues I'd like to touch on to demonstrate those key problems are impacts to feeding habitat in Camden Bay and the so-called cumulative impacts analysis performed by the Minerals Management Service. Now, first, both NMFS and AEWC's whaling captains have previously recommended to the Minerals Management Service that it pay particular attention to disturbing feeding behavior, especially with respect to mothers and calves who have unique nutritional needs. This point was raised by NMFS in the 2008 Biological Opinion where it issued a conservation recommendation that MMS give, quote-unquote, special scrutiny to drilling operations that could displace bowheads from important feeding areas. This is in the excerpt of record at page 1360. And NMFS further warned that whales could, and I quote again, suffer consequences of biological significance. And this is in the excerpt of record at page 1354. So NMFS clearly raised the prospect of a significant impact from exploratory drilling in feeding habitat and asked that MMS consider that issue in the future. And NMFS says there's no disruption because the lease area is not a high value area for bowhead feeding, in essence, is what they said. And they said that was consistent with the Biological Opinion. And so it comes to us, and how is what MMS decided so unreasonable that it constituted an error, they didn't take a hard look? That's, since we're not the marine mammal scientists, that's the real question for us. Yes, Your Honor. And I think that that's absolutely the right question and the right focus for the court. And I think what the court should do is should look not at what the Minerals Management Service has said in its briefing before the court, because we believe they've submitted post hoc rationalizations in looking at Shell's own monitoring data, which documented thousands of whales in Camden Bay and that feeding was the most commonly observed behavior. That was the data in the record. MMS did not discuss or analyze that data at any point in the environmental assessment. It was not discussed. It was not cited. And there was nothing in the record that MMS could point to where any of its own experts actually reviewed that data and reached a conclusion on its significance. Instead, what MMS has done, it has said in its response brief, without any support to the record, that that data is insufficient to establish Camden Bay as an important feeding area. Well, they're tearing from the 2003 EIS, and then they have the list in the EA of the people who had reviewed it as the experts. So is there some, like, smoking gun issue that where I can turn to in their EA and say there's an error here or there's something missing? Yes. So, Your Honor, the 2003 Multicell EIS summarized previous studies that had looked at feeding in the eastern Beaufort. Shell's data is site-specific to the specific drilling locations, which was collected after 2003 during seismic activities in preparation for this exploratory drilling operation. That data was collected in 2007 and 2008, and that was the data that the parties that the public asked MMS specifically to assess in their comments on Shell's exploration plans, and that is the specific data that is nowhere discussed in the environmental assessment or anywhere in the administrative record. So they say their findings are consistent with it. So why is it that not? Why is that so glaringly obvious that they didn't consider that issue? So that's an argument they've made in their response brief, and that argument, first of all, is unsupported by any statements of their own experts. So there's no expert statement from the agency on that issue which the court can defer to. That argument was made by appellate counsel in the response brief without any citation or record support. And so that is simply an argument, a post hoc argument, which this court has repeatedly said does not make the cut. It has to be set forth in the environmental assessment at the time of the decision. So let me just clarify. Let me just say, ask, first of all, is this, do you think, your best argument as to the omission or an error that MMS undertook? So I think that this is ‑‑ No, I need to focus in on something. I mean, you had, there's 500 issues that you raised in your briefing. Yes. And they're all, MMS has their response, which says we looked at it, we were reasonable. And there's nothing very glaring that I could see. So I'd like to focus in on what's the glaring error. Yes. So this is certainly one, and this is a major concern of the whaling captains. The other major omission, which I think is easier for the court to understand perhaps, is the cumulative impacts analysis, which is the second point that I would like to discuss. So MMS, Your Honor, also failed to take a hard look at the cumulative impacts of the two drilling operations in combination with each other, in combination with other industrial activities in 2010, and in combination with the reasonably foreseeable activities in future years. And so with respect to the activities in 2010, there is no analysis whatsoever of any of the other industrial activities that are planned. Okay. So they say they're too speculative, they're too far out there, there wasn't anything specific. Is there something specific that has been planned in the works that was necessary for them to consider? Yes, Your Honor, there absolutely is something specific. There are at least four seismic operations planned in the Beaufort and Chukchi Seas for this summer, this open water period starting in July, at the same time as the exploratory drilling operations. Shell's drilling are not at all the only industrial operations planned for the Arctic in the summer. The record demonstrates that there's at least four other seismic operations planned at the same time in the same locations. One of those is by Shell itself, and none of that information was looked at by the agency. And so the impacts are not simply from these two drilling operations, but they need to be placed in the context of four other seismic activities, which NIFS and MMS admit have the potential for biologically significant impacts. Okay. So is that your strong, one of two strongest arguments that you're saying there were four? At the time that the EA was done, there were four other specific activities planned by other, or I guess Shell was one of them. Shell was one of them. There were four other specific activities that were planned in that area that were not reviewed in the EA. Is that? Yes. Yes. And the other issue that I would like to touch on briefly for the Court is the air quality issue. This, again, Your Honor, is an issue where the Minerals Management Service simply excluded from its analysis an important issue. There's no analysis whatsoever in the record regarding the formation of secondary pollutants, including particulate matter and ozone, which have known health impacts. And the North Slope populations are dealing with elevated levels of heart and lung disease. Could I go back to the bowheads for a moment? I'd just like to clarify specifically what you're saying the error was. Yes. That their failure, at the time they prepared their EA, they should have specifically addressed Shell's 2007-2008 reports. Is that the error? Yes. The MMS, as requested that it do, consider the impacts of industrial operations in important feeding habitat and deflecting whales away from feeding habitat during the fall migration, particularly with respect to mothers and calves. And are you talking specifically about they failed to mention Shell's 2007-2008 reports or something else? They failed to assess the significance of that information and whether the operations would, therefore, have an impact on bowhead whales in that way. Thank you. I'd like to reserve two minutes for rebuttal, and the rest of our time I'll give to Ms. McDonald. Thank you. May it please the Court, my name is Deirdre McDonald, and I am representing the petitioners in the native village of Point Hope Petitions. I would like to just focus on two issues today. First, I'd like to talk about MMS's failure to assure that the oil company provided the emergency planning information required by MMS's own regulations. And second, I'd like to talk about the lack of oil spill analysis, and in particular why the analysis done at the lease sale stage does not provide enough information to inform the decisions that MMS needs to make at the exploration stage. As to the emergency planning regulation, MMS has an Alaska-specific regulation with straightforward language requiring oil companies to provide plans that inform it what they will do in the case of an emergency if one of their support craft or the drill ship itself is damaged or lost. When MMS received Shell's Camden Bay plan, its staff recognized that this information was missing, but ultimately MMS did not require Shell to provide the information. This information is critical here because Shell's own plans say that in the event of a catastrophic blowout, it will use its drill rig to drill a relief well if that becomes necessary, yet it never says what it will do in the event that the drill rig itself is lost. Now, MMS says they have enough information. They have a curtailment plan. The exploration plan does address the loss of the ice support vessels through a plan that implements curtailment of critical operations. So why wouldn't we defer to the MMS's determination that that was sufficient? Because the curtailment plan is a wholly separate requirement of the regulations. That requirement is contained in paragraph B. Paragraph A contains an independent requirement for this type of planning. And what the curtailment plan does is it simply provides procedures for how Shell will decide when it's necessary to stop drilling. It doesn't say and then what happens. The information required by paragraph A is what goes to how they deal with a ship being lost or damaged. And it's the reason it didn't comply with the specific regulation. It serves a different purpose. The curtailment plan is about when Shell needs to, under what circumstances Shell needs to stop drilling. The requirement of paragraph A of the regulation is about how you respond to the loss or damage of one of the vessels. And isn't curtailing operations one of the ways they would do it? It could be, but it's not necessarily all of the ways. And they could have loss of damage of a vessel when they're drilling, when they're finished drilling. And, you know, it might be loss of a support vessel that they could find a way to, you know, replace or work around without stopping drilling. The curtailment plan is just when do we stop drilling. The questions that are answered by the subparagraph A should be what do we do? How do we secure the well if the drill rig is unable to function? How will we move the drill rig off site if it's disabled? Questions like that, they're not answered by the curtailment rig or the curtailment plan. I'd like to briefly turn to the oil spill analysis here. You have two minutes left, which your court counsel said. Right. We'd like to save time for rebuttal. Well, I'd like to just briefly say then why the analysis at the lease sale stage is not adequate. And this court recognized that in the Tribal Village of Accutan case when it said the amount of specificity necessary to meet NEPA's requirements varies at each of OCSLA's stages. The court went on to say that at a lease sale stage an oil spill analysis is at best speculative. And here the oil spill analysis at the lease sale stage is not enough to inform the decisions MMS has to make now so it can look at alternatives of how to minimize the risks. Thank you. May it please the Court, I am David Shilton, representing the Respondent Mineral Management Service and Department of Interior. With me at counsel table for Respondent Schell is Ms. Sullivan. She will take five minutes of the time. And also here is Ms. Cruz from the Alaska Attorney General's Office who will not be presenting an argument but can answer any questions if you have them for the State of Alaska. I think I'm going to speak first about the bowhead whale issue. Of course, the question before the court in reviewing an environmental assessment is whether the agency provided a convincing statement of reasons for its conclusion that there won't be significant impacts on the environment. And I think the petitioners are overlooking some of the important reasons that were given in the environmental assessment for that conclusion. Primarily, with respect to bowheads, they have been very extensively monitored over the past three decades as oil and gas operations have gone on. And the studies have shown that the noise from drilling has a temporary effect on some bowheads, but that effect is minor and does not appear to have any. Mr. Shilton, I looked in the records and it talked about decibel levels of 120 decibels. 120 decibels is the sound that a drill makes on the pavement out here. And you see those men working with earplugs. Bowhead whales don't have earplugs. Isn't that a very loud noise for a bowhead whale? Not for a bowhead whale. The National Marine Fisheries Service has determined that the level of noise that actually could conceivably cause injury is 180 decibels. The 120 decibel level is that level of noise that may cause some bowheads to change course to avoid the noise. It's something they notice. But actually, noises in the ocean, there's a fair amount of background noise in the ocean around 100 decibels itself. So in over 30 years of drilling and seismic activities, which actually have more noise associated, there's never been any documentation of adverse effects on the bowheads. And, in fact, the bowhead population has been healthy and is increasing at about 3.5 percent a year. Now, opposing counsel specifically focuses on the failure to consider Shell's 2007-2008 reports. Was that a hole in your analysis? No, it's not. The environmental assessment points out that bowheads feed opportunistically. And there are a couple of areas that are important feeding areas. One is near Barrow. That's quite far away. The other is in the far, the Canadian Beaufort. But this area has never been regarded by nymphs or anyone as an important feeding area. But it is not surprising that some years you will find bowheads feeding in this area or any other area. If there's plankton there, they'll eat it. And so these two monitoring reports, they're monitors onboard seismic ships. They observed some bowhead whales, and it appeared that a fair percentage of them were feeding. But that doesn't show anything different than what MMS already knew, which is that bowheads will feed opportunistically. And nymphs has never indicated that this area where the drilling will be is an important feeding area. And I think it's important that nymphs in its biological opinion, which finds, by the way, that the whole course of oil exploration will not endanger the whales, it says that there are a couple of things that MMS should look out for, and that is where there is noise that might impact a particular area that's critical for the whales. And that's exactly what MMS did here when they made sure that Shell cannot start operations until July 1st, because the one critical area for the whales is when they're migrating north through the Chukchi Sea, because as the ice is just starting to leave the land, there's a pretty narrow area that they're traveling in. But there's no evidence that the area around Shell's prospects is similarly critical. Could you address the cumulative impacts issue that was raised by opposing counsel, that there were four other seismic activities planned in July that were not considered in the EA as part of cumulative impacts? When MMS issued these EAs, there were no permits pending before MMS. You have to get a permit from MMS to do seismic, and there were no pending permits. Now, since that time, and this is, you know, beyond the record, but there are two permits that have been submitted to MMS. None have been granted. But I think this Court's cases say that an agency does not have to speculate about what may come in the door in the future in the same area. What it needs to do is when it approves a future seismic permit, then it needs to consider the cumulative impacts with what it approved here, and it will do that. But the other point with respect to cumulative impacts is that the EISs, to which these EAs tier, have an extensive analysis of the cumulative impacts of all expected oil and gas exploration and development that's done pursuant to the leases. And so those contemplate a scenario that would have as many as two exploratory drilling operations at the same time and as much as six seismic permit shooting activities per summer. And so those EISs consider, you know, a much broader scope of activities. And so what we have this summer is fairly limited activity, only one exploratory drilling ship, and it looks like now very limited seismic. And so this has been adequately covered in the lease sale EISs. How about the exploration plan or the emergency plan that was submitted by Shell not including the information about loss or damage to support vessels or disablement of support vessels? Well, as Ms. McDonald said, the emergency plan information did include information about securing the wells, and that is what is critical if there is a fire or other accident. Shell provided information about how it would very methodically make sure that the well is secured, that the blowout preventer, that it works, and that is the information that MMS is looking for in that regulation. Now, the petitioners have focused on drilling a relief well. Well, the regulations do not say that an applicant has to submit specific information about drilling a relief well. In this case, MMS determined that it would be appropriate to ask Shell as a condition to starting up its drilling, that by that time Shell would need to provide some additional information about exactly how it would secure an alternative vessel that could drill a relief well. But that is really going above and beyond what the regulation requires. Now, opposing counsel is also saying that it didn't answer the questions that that section of the regulations requires, that, for example, how would Shell secure the rig, how would Shell move the rig off-site, and that the curtailment information, it really goes to a different section of the regulations. Was it reasonable not to require the information relating more specifically to loss or disablement of a drilling unit, loss or damage of support craft? Well, I think the curtailment program describes how Shell will curtail in all emergency instances, whether it's ice or fire or what have you, describes how it will secure the well. And so the fact that that information may be included in its curtailment plan doesn't mean that the emergency plan is deficient. The regulations don't, you know, don't forbid one plan referring to the other plan and relying on the other plan. But I think the basic point is that Shell provided the information that MMS needed to make sure that this was going to be a safe operation. In the minute or so you have left before the co-council's time, let me ask you. It is now May 8th, which is not so far from July when the drilling is supposed to start. Of course, I have no idea what we will decide at the conference, but there are two possibilities. One is that we will approve what the agency did, and the other one is that we would vote to disapprove. Given that it may take a while to write this position, I don't know, but it's certainly possible in this case. Can you tell us on the ground what the situation is and what we could or should provide by way of information to the parties? I mean, I take it you would not want to hear on June 30th what our decision is. Right. So I'm just asking for the practical considerations at this point and consider both possibilities. Right. The possible results. The exploration plan permits Shell to transit the Bering Straits on July 1st and to start drilling in the Chukchi Sea by July 4th. So assuming that Shell gets all of the permits it needs, that would be the- Are you still waiting for the Clean Air Act? You are there, still waiting for the Clean Air Act. Right. There's Clean Air, there's National Marine Fisheries Service, Incidental Harassment Office. Any of those contingent on what happens with us? Are they just going forward? As far as I know, they are just going forward. They also have to obtain a permit to drill from MMS. So that is one more regulatory hurdle they have to pass with the Department of Interior is to get that. So there are a number of hurdles, but if they get all those, they would like to start at the very beginning of July. Does that answer? Maybe that's a question better presented to counsel for Shell. Thank you, Your Honor. I'll give you a couple of extra minutes. Good morning, Your Honors, and may it please the Court. I'm Kathleen Sullivan, and I represent the Shell Intervenors. To answer Chief Judge Kaczynski's question. You can take your full five minutes, and you can answer my question at the beginning or at the end if you want. Well, to answer Chief Judge Kaczynski's question first, we respectfully submit that this Court should swiftly, because this case is expedited, issue a decision denying review here because the Petitioners have not remotely come close to the standard for review that Judge Akuta correctly referenced earlier. The standard here is arbitrary and capricious. The standard here is not scientific quibble. The standard here is there a way in which the agency has entirely failed to consider relevant impacts, and they like to leave it up to review. I understand that Shell would like to win. Well, we believe winning sooner rather than later would be best, Your Honor. The Shell has invested. But let me ask you a subsidiary question. This is not, and again, I have no idea how we will vote. So I'm managing my mind the practicalities of the situation. This is an issue that will arise year after year, right? Not necessarily, Your Honor. Some plans might be multiyear plans. This year happens to be a plan that's for a single season involving a single drillship, involving a mere exploration plan. This is not the development and production stage. It's a four-month open and close. And you, having a published opinion, would probably be something that's useful, more useful than something brief and unpublished. Your Honor, expedition is our great goal here because Shell has invested $3.5 billion. It invested $77 million already this year. It's putting $55 million more into this effort. It's a short season. You can only get the drillship into open water in the Arctic Sea between July and September. When do you have to start moving equipment and incurring the expenses of? We've already incurred expense in mobilizing the equipment, Your Honor. Substantial expense. We're ready to go. And the key here is that if you rule quickly, we'll be able to go this season. We don't think you need to make any new law here in order to deny petition for review. Just to focus on the four items that the — by the way, Your Honor, you asked about additional permits. As counsel for the agency correctly mentioned, we would still need to get an incidental harassment authorization, a letter of authorization for certain species. We need to get the air permits. And just to amplify what counsel for MMS said, we already have air permits for both the Chukchi and the Camden Bay areas. It's just that they're now in the appeals process, and we need to have them come out of the appeals process. And, of course, we need approval of our application for a permit to drill. So there's four major approvals that need to come, but they can easily come in the time remaining between May 6th today and July 1st. And we anticipate we could move completely with all of those permits. So expedition is very much in Shell's interest. That's why we moved to expedite, and we're very grateful for you granting it. To turn to why it is an easy case to resolve, though. But is it realistic, because there may be a petition for a re-hearing in a bank, and then there may be a petition for a social merit in the Supreme Court of the United States. Is it really realistic to think that you can get started by July? Yes, Your Honor. We don't think we we think there'll be no basis for a stay, because if I could turn to no basis for a stay of mandate, because we think that you can easily resolve this case in favor of the agency's approval. And Judge Akuta asked, where is the smoking gun? And, of course, there is none in this record. Petitioners, the best they could come up with today were their four key items. And on Bowhead, Wales, the agency has already addressed the point that the new information in the 2007 and 2008 studies was merely cumulative of the already existing information about Bowhead, Wales that was detailed in the 2003 multisale EIS. It didn't show anything new. The agency looked at the studies and said it didn't show anything new. And, Your Honor, the reason why it couldn't show anything new is that the temporary diversion, of course, that some individual members of the Bowhead, Wales species might make doesn't come close to amounting to meeting the legal standard here. The legal standard here, as the Court made clear in the Environmental Protection Information Center case, is not deflection of individual members of the species. It's population-level effects on the species. And even if you take everything that counsel for the other side has said today about Bowhead, Wales individuals, they haven't come close to saying there's any population-level effect that will harm Bowhead, Wales as a species who have been prospering despite substantial activity, industrial activity in the Arctic and an increase of 3.2 percent in population a year. Turning to their next supposed key issue, the cumulative impacts of other activities in the Arctic Sea this summer. The key, and let me just repeat what the counsel for the agency said, none of that activity has yet been permanent. There is no reason the agency had to take into account the speculative notion that some other companies from Norway or elsewhere will come in and do seismic studies this summer before they have even applied for, much less received permits. So those have not yet been permitted. Turning third to emergency preparedness. Counsel said we didn't submit enough plans for what would happen if there was a loss or disablement of the drilling unit or of a support craft, but we certainly did. And, Your Honor, it was not just the curtailment plan. It was also the ice management plan and the emergency preparedness plan. And if I could refer, Your Honor, to the places in which we made specific, in which the agency made specific findings that we provided adequate information about emergency preparedness, I would refer you to excerpts of record 1087, supplemental excerpts of record 87, where it's clear that we have plenty of plans that were amply sent to the agency and approved by the agency for emergency. It's not just the curtailment plan. It's multiple plans that work together. And finally, counsel referred to the danger of oil spills. But the analysis of oil spills that MMS did for the EAs here tears back to the 2003 EIS, which made not only a study of the likelihood, the remote and infinitesimal likelihood of spills, it also made a study of the consequences of spills. And if you look at the 2003 multi-lease, multi-sale EIS, the subsequent EAs for the Chukchi Sea, and the 19, and the 2007 lease sale 193 study for Chukchi, they all analyzed oil spills not just with respect to likelihood, but also with consequences. Now, opposing counsel says in their briefing the, I think it was for the Chukchi Sea, there wasn't an analysis of the very large 150,000 barrel plus oil spill. I, in fact, didn't find one. Is there such an analysis? Not in the 193 lease sale EIS, Your Honor. But that, the EA tears back not just to the EAs. It tears back to the 2003 multi-sale EIS. And remember, 2003 multi-sale EIS covers Chukchi as well as Beaufort. And so the proper tearing back to the 2003 study covers oil spills with respect to the Chukchi Sea, with respect to very large, Your Honor. But just to return, Chief Judge Kaczynski, we respectfully submit that this case is so straightforward a case for denial of the petition that we respectfully request that you issue an expedited review. The shell has waited many long years to reap the benefits of investment. The President just announced his recommitment to the importance of exploration in the Arctic Sea. And to hold this up another year when the season is short and we have the chance of getting all the permits in place to go forward this summer, and the agency has given you an exhaustive 86-page and 113-page environmental assessment that tears back properly to prior studies and takes into account everything petitioners have raised, it doesn't come close. Their arguments don't come close to showing that the agency committed a clear error or an abuse of discretion or an arbitrary and capricious disregard of scientific evidence. For Mr. Winner to come forward and say, oh, well, they didn't produce their own expert, there's no requirement that the agency send a particular expert. It's about deference to the agency, not deference to a particular expert within the agency. And if Lands Council v. McNair means anything, it's that this kind of scientific quibbling with the agency within the core area of its expertise cannot be the basis for holding up an approved development. Thank you very much. Thank you. I'll give you a little more time. If you both want to talk, I'll give each a couple of minutes, because we did take additional time with opposing sides. So you can have a total of four minutes, and you can divide between yourselves. Thank you, Your Honors. First, I'd like to touch back on the issue of the emergency planning reg and what Mr. Shelton said about the curtailment plan. He said the curtailment plan provides a full explanation of how they will secure the well in an emergency situation. But that plan assumes that the drill ship is intact, and they use the drill ship to secure the well. There's no plan for if the drill ship had sunk, then what would they do? That's what's missing. Now, opposing counsel also mentions the ice management plan and the emergency preparedness plans is also including relevant information. Is that not right? It includes different information, but it doesn't include this specific information. It's all required by the regulations, and this specific information is missing. In fact, I believe Ms. Sullivan cited to page ER-1087, but if you look at that page, you can see that it assumes that the drill ship is functional. It says, It doesn't say what happens if the drill ship is not able to move or if the drill ship has sunk. I'd like to move on and just briefly speak to the cumulative impacts claim. I'd like to just focus on the additional more narrow claim that we made regarding cumulative impacts, which was that the agency here defined cumulative impacts so narrowly, contrary to the established NEPA definition, that it was able to conclude without looking that there's no cumulative impacts from doing activities both in the Beaufort Sea and in the Chukchi Sea, which are both important parts of the bowhead whale habitat. And we think that is an error because it's not just they said that cumulative impacts were those impacts that overlap in time and space. And it's been well established that cumulative impacts can be those that affect the same population of a species, even if they're separated in time and space. So what specifically, because your co-counsel said that there were four other seismic activities planned in July, that was specifically the cumulative impact that was ignored. What are you specifically saying was ignored? I'm saying what was ignored was the cumulative impact of Shell's two projects, one in the Beaufort and one in the Chukchi, and they will be in between those two. Well, because the NMS did the exploration plan separately. I guess reviewed them separately, as they're required to do under the timeline and the regulations. But they do, each of them, mention the other project. So what was the error? They dismissed the possibility of cumulative impacts by saying they're too far apart. That's not the hard look NEPA requires. That's not the definition of cumulative impacts. I don't want to take Mr. Winter's time, but I want to say one additional thing, and that is Ms. Sullivan talked about the multisale EIS as looking at the Chukchi. It did not. The multisale EIS looks at three sales in the Beaufort. They're now trying to rely on that for the glaring omission of analysis of a very large sale, but it never looked at the Chukchi Sea itself. Thanks. Your Honors, I just want to make one or two quick points. Mr. Shilton emphasized the fact, he argued, that NIMFS had never identified Camden Bay as a specific location where there should be heightened concern over bowhead whales. But, in fact, what NIMFS did is it identified the fact that deflection from feeding habitat could have biologically significant impacts. That is clear in the record. And it directed NIMFS in a conservation recommendation that it had to do that site-specific analysis in the future when looking at site-specific proposals. So NIMFS told MMS to do that analysis as part of the biological opinion when NIMFS or when MMS was looking at these site-specific proposals. So that is the analysis that we argue MMS failed to conduct here in this case. There is no analysis by MMS of the importance of this particular area for feeding and the impacts of deflecting whales from this area. The second quick point I would like to make is that on cumulative impacts, we believe the government has it wrong both on the law and on the facts as it relates specifically to additional seismic activity. On the law, the legal test that they're trying to create is that there has to be a permit application submitted to an agency in order for there to be a reasonably foreseeable activity. That is not the law. The law in the circuit in its current VBLM, which is 284F31062, is that the analysis, quote, unquote, must be timely and it cannot be deferred to a future date when meaningful consideration can be given now. So the test is whether there's enough information for there to be meaningful consideration given now. The review for abuse of discretion, and the question is not whether you would prefer that they do it now or we think it's a bad idea. The question is, given the contingent nature of these activities, whether the agency abuses discretion by deferring. If agencies did everything now that they could do in the future, they'd never get anything done because, you know, sequencing is part of the process of life. It's certainly part of the process of government. So why is it an abuse of discretion to say, look, this is not yet on the table. We're going to defer consideration to a later time when this becomes more of an issue. Yes, Your Honor, because as this Court has said, it has to be done. It must be timely. And the facts in this case, these are the facts that are in the record that MMS knew at the time it made its decision. With respect to the Chukchi, it knew that Statoil was planning high-energy seismic activities, high-energy marine seismic survey activities. It knew that they were going to be conducting 2,400 square kilometers of seismic surveys. They knew which sea, what time, what lease blocks those activities were going to be conducted on. Now we're being told to wait, that that analysis will be done at some point before Shell goes out and before the seismic activities start. Why can't that analysis be done when they get their permit? And they say Shell is already out there doing it, and therefore deny or defer your permit because of these other activities. I mean, it doesn't have to be. Why can't it be done just as well at that stage? Well, Your Honor, it forecloses management options if they wait for the second activity because the mitigation measures could be imposed on Shell's drilling activities. And so they have to look at those together to say, how do the two fit together? If they simply wait and only review it with respect to the seismic activities, they lose the ability to condition the drilling to address the potential. But that's their risk if they want to do that. But that's not the risk that NEPA allows. What NEPA says and what this Court says, it must be timely at the earliest time possible giving the meaningful information that we have. Here there was more than meaningful information, and we would also ask the Court, look at the Epic case where in that case the Forest Service did that analysis. Thank you. Thank you. The case is argued and will stand submitted. We are adjourned.
judges: Kozinski, Bea, Ikuta